IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CARRIE REGINA HICKS          :
                             :
        Plaintiff-Appellant, :        CIVIL ACTION
                             :
v.                           :        NO. 1:12-CV-1663-JEC-ECS
                             :
CAROLYN W. COLVIN,           :
Commissioner of Social Security :
                             :
        Defendant-Appellee.  :

**FINAL REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff-appellant ("Appellant") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claims for disability insurance benefits and supplemental security income. This case is before the Court on the administrative record and the parties' pleadings and briefs. For the reasons expressed herein, **IT IS RECOMMENDED** that the Commissioner's decision be **REVERSED AND REMANDED.**

I.
**Procedural History**

On August 11, 2009, Appellant protectively filed an application for disability insurance benefits. (T. 63-66). On August 21, 2010, Appellant protectively filed an application for supplemental security income. (T. 430-38). In both applications, Appellant

alleged a disability due to major depressive disorder, anxiety, acid reflux, and fibroid tumors, beginning August 28, 2008. (T. 31, 63, 94, 430).[1] Appellant's claim was denied initially and upon reconsideration. (T. 29, 31, 36, 439). On August 3, 2011, an Administrative Law Judge ("ALJ") held a disability hearing. (T. 443). The ALJ issued a decision on August 26, 2011, finding Appellant not disabled. (T. 14-23). The Appeals Council denied her request for review. (T. 6). On May 11, 2012, Appellant filed a complaint in this Court seeking a review of the Commissioner's decision. [Doc. 1].

## II.
## Factual Background

At the time of the hearing, Appellant was fifty-one years old. (T. 448). She testified that was currently divorced and living in an apartment with two of her children, one of whom was fifteen years old and the other "older." (T. 449-50). Appellant's support came from her older daughter; "family and friends"; and food stamps. (T. 450-51). In relevant part, Appellant alleged a disability due to major depressive disorder, anxiety, and acid reflux. (T. 448).

## A.   Work History

Appellant testified that she had not worked since August of 2008, when she was fired from her cashier job at BrandsMart USA

---

[1]      The Administrative Record is abbreviated as "(T. [page])."

2

after getting into a fight with a co-worker. (T. 451, 454); <u>see also</u> (T. 160, 242). She testified that she had experienced problems getting along with co-workers and supervisors at other jobs as well. (T. 454). She said that she "used to be a people person," but at some point she "just started feeling" that people were against her: "I don't remember exactly when, but seemed like when I do stuff it was —— people thought I was always shining them or something . . . ." (<u>Id.</u>).

Appellant's prior jobs were also cashier positions, which involved some shelf stocking. (T. 451-53). Before BrandsMart, Appellant worked as an assistant customer service manager at a grocery store, where she "[c]hecked the cash registers", "ran the register[s] sometimes when they got short or busy," and "close[d] out the store at night." (T. 452). Appellant has also worked as a cashier at a liquor store, a Kmart, and in the gift shop of a casino. (T. 452-53).

**B.   Medical History**

**1.   Psychiatric Treatment**

On April 24, 2009, when Appellant was forty-nine years old, she went to the Clayton Center to seek treatment for depression, anxiety, and difficulty concentrating. (T. 212, 214-15). She reported that she had first "experienc[ed] problems with depression in early adulthood but did not know depression was [what] she was

3

experiencing." (T. 215). She said that she had sought mental health treatment before, in 1999, but that she had not participated in therapy in three years. (Id.). The interviewing therapist noted Appellant's "flat affect, sad mood, and guarded and dependent behavior," and recorded that "[Appellant] appears to be experiencing difficulty coping with the fact that her mother was not involved in her and her siblings['] life during early childhood and adolescence." (Id.). Appellant was diagnosed with major depressive disorder, recurrent and moderate, and "partner relationship problems," exacerbated by her unemployment, family conflict, and history of physical trauma. (T. 215A). The therapist referred her to Dr. Ramesh Amin, a psychiatrist, for counseling and medication management. (Id.).

On May 6, 2009, Appellant first met with Dr. Amin. (T. 243). She complained about feeling depressed, crying easily, not wanting to get up in the mornings, experiencing a loss of interest, and feeling hopeless and helpless. (Id.). Dr. Amin noted that she was tearful, but found her to be alert, oriented, calm, and cooperative. (Id.). He also diagnosed her with recurrent major depressive disorder, with unemployment as an additional stressor; gave her a

4

Global Assessment of Functioning ("GAF") score of 65;[2] and prescribed Celexa.[3] (Id.).

On June 3, 2009, Appellant returned to Dr. Amin for a follow-up appointment. (T. 240-41). She reported to the nurse that her "medication [was] not relieving [her] depression" and that she occasionally heard voices and saw shadows. (T. 241). Dr. Amin took note that Appellant felt "pretty much [the] same," increased her Celexa prescription, and added a prescription of trazodone "for sleep."[4] (T. 240).

---

[2]    A GAF score is an assessment of an individual's "overall functioning" with respect to her psychological, social, and occupational limitations. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 33 (4th ed. 2000) (hereinafter "DSM-IV"). In scoring an individual's GAF, the mental health evaluator analyzes the severity of the individual's symptoms as well as her functioning along a scale of 0-100. Id. "The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range." Id.

[3]    Celexa is a brand name for citalopram, which is in a class of antidepressants called "selective serotonin reuptake inhibitors." It is used to treat depression by increasing one's level of serotonin, which is "a natural substance in the brain that helps maintain mental balance." MedlinePlus, U.S. Nat'l Library of Med., Nat'l Insts. of Health, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html (last visited June 27, 2013).

[4]    Trazodone is also used to treat depression; it is in a class of medications known as "serotonin modulators." MedlinePlus, U.S. Nat'l Library of Med., Nat'l Insts. of Health, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html (last visited June 27, 2013).

AO 72A
(Rev.8/82)

On December 3, 2009, Appellant reported to Dr. Amin that she was experiencing financial problems and was stressed about not having a job. (T. 220). Dr. Amin noted that she appeared depressed but recorded that she was "tolerating [her] meds well." (Id.). A mental status examination indicated that she had limited insight and judgment, a flat affect, guarded behavior, and a "depressed/sad" mood. (T. 219).

On April 12, 2010, Appellant returned to Dr. Amin and told him that she was "not sure [that] Celexa is helping." (T. 265). She reported feeling tired, anxious, "in a daze[,] and out of [her] body." (Id.). She told Dr. Amin's nurse that she had been taking Celexa "only off & on" because it "made [her] head feel funny." (T. 266). Dr. Amin decided to change her prescription to Zoloft. (T. 265).

On July 14, 2010, Appellant told Dr. Amin that she was "doing ok," but that she was "tired of life." (T. 302). The nurse recorded Appellant's mood as "labile" and noted that her affect alternated between "crying" and "sad." (T. 303). Appellant told the nurse that she only took her medication "3 days out of the week." (Id.). She complained that the medication irritated her stomach because of her acid reflux. (Id.). The nurse advised her of the importance of being compliant with her medication and advised her to take it with food.

AO 72A
(Rev.8/82)

(Id.). Dr. Amin noted that she was "still dep[ressed]" and increased her Zoloft prescription. (T. 302).

The record does not reflect that Appellant ever returned to Dr. Amin for further treatment. Instead, on October 25, 2010, Appellant followed-up with another psychiatrist, Dr. Deen Chandora. (T. 323). Appellant reported that she had been feeling better since the increase of Zoloft in July, even though she had been feeling "very sad" a couple of days earlier over a disagreement with one of her daughters. (T. 324). Dr. Chandora recorded that she had a "sad" mood and "guarded" affect. (T. 323). He increased her trazodone dosage, maintained the Zoloft prescription, and advised that she continue attending counseling for her "interpersonal relations problem[s]." (Id.).

### 2.  Individual and Group Therapy

While receiving psychiatric treatment, Appellant also attended individual psychological counseling sessions on a regular basis. On April 28, 2009, during her first session with Dr. Charles A. Dillon, Appellant "[t]earfully reported that she is tired of being sad and depressed all the time." (T. 244). She said that she "cries a lot, often for no reason that she can identify," and that the problem has been getting worse. (Id.). She also reported feeling anxious "for no reason." (Id.).

Appellant's individual therapy sessions continued two or three times a month for over a year. At many of these sessions, Appellant was noted as "tearful" or "sad," and she would often cry when discussing conflicts with her mother or sister. See, e.g., (T. 225, 237, 239, 242, 340, 343, 345, 346). In June of 2009, Appellant complained that she "always feels used by people after a while" and that she "has a hard time getting close to people." (T. 237, 239). In July, her therapist recorded that Appellant "has some paranoid ideation about 'others not liking her and being out to get her.'" (Id.). In August, Appellant's therapist noted that she "appeared very depressed" as evidenced by her "low speech volume and sad affect." (T. 228). In October, Appellant reported that she "cries on a daily basis and does not enjoy any of her previous activities." (T. 225). The therapist noted that Appellant had missed an earlier session "because she has been crying so often." (T. 224). In November, Appellant reported that she was "still crying on a daily basis and still does not enjoy any of her previous activities." (T. 381).

On December 10, 2009, Appellant reported to her therapist that had not been out of the house in five days and that she felt "outside of [her] body and looking at [her]self." (T. 376). In February of 2010, after assessing Appellant for suicidal ideation, her therapist helped her create a "crisis plan." (T. 367). In March,

8

Appellant reported that she had been "losing track of days and time." (T. 354). In May, Appellant told her therapist that she had been crying "much less," about "once a week." (T. 346). In June, however, she reported that her crying episodes had increased after another conflict with her sister. (T. 345). Later that month, in a telephone conversation with her therapist, Appellant stated that she had missed her previous two appointments because she was depressed and "did not want to leave the house." (T. 341).

In July of 2010, Appellant reported that she had been evicted from her apartment. (T. 336). She told her therapist that she had moved in with her oldest daughter and was sleeping in a room with just a mattress. (T. 333). Appellant said that she "hate[s] where [she] [is] in life" and is "tired of everything." (T. 333, 336). She also reported that she had not been taking her medication. (Id.). On August 24, 2010, at her last individual therapy session, Appellant stated that she still was not fully compliant with her medication because she did not want to become "dependent" on it. (T. 330).

Throughout the above individual counseling sessions, Appellant also attended group behavioral health counseling sessions, starting March 8, 2009, and continuing until November 15, 2010. (T. 321-64). These sessions addressed subjects similar to those addressed in Appellant's individual counseling sessions, but in a larger setting.

9

Appellant actively participated in the discussion during most of these sessions, and the session notes largely reflect that Appellant had "made progress," though at times her progress was recorded as "minimal" or "moderate." <u>See, e.g.</u>, (T. 321-22, 325, 327-28, 332, 338, 342, 344). At the majority of these group sessions, Appellant's affect was "sad" and her mood "depressed." (T. 321-22, 325, 328, 332, 344, 347, 353, 362, 364).

**C.   Opinions Regarding Appellant's Ability to Work**

    **1.   Consultative Psychological Examiners**

        **a.   Dr. Betty McCurdy**

On January 19, 2010, Appellant met with Dr. Betty McCurdy, a licensed psychologist, for a consultative psychological evaluation. (T. 306). Appellant reported feeling "all right," but Dr. McCurdy noted that "she appeared depressed and was quite tearful." (<u>Id.</u>).

Appellant reported that she had worked as a cashier for different companies for fourteen years, during which she was "sent home a number of times due to crying spells at work." (<u>Id.</u>). She said that she was eventually let go from her last job after a number of episodes "during which she was crying and so emotionally upset that she was unable to function." (<u>Id.</u>). She also reported "difficulty concentrating on her job" as a result of her depression. (<u>Id.</u>).

10

In discussing her activities of daily living, Appellant said that, three or four days a week, she has no energy or motivation and neglects her personal hygiene. (T. 307). She is, however, able to make sure that her youngest daughter gets dressed, bathed, and ready for school in the mornings. (<u>Id.</u>). She said that she spends a typical day "mostly sit[ting] around and ruminat[ing] about the way her life is." (<u>Id.</u>). Her oldest daughter has to remind her to bathe and change clothes. (<u>Id.</u>). She said that she occasionally cooks simple meals and cleans, but her daughters do most of the housework. (<u>Id.</u>).

Appellant reported that her depressive symptoms had progressively worsened since she lost her job in 2008. (T. 308). She said that every day she experiences anhedonia, crying spells, low appetite, insomnia, psychomotor agitation, social isolation, heightened irritability, low energy, difficulty concentrating, feelings of worthlessness, guilt, and fleeting suicidal ideation. (<u>Id.</u>). Appellant also reported symptoms of anxiety, such as general nervousness, sweating, shaking, palpitations, fear of losing control, and fear of dying. (<u>Id.</u>). In addition, Appellant said she had been experiencing memory problems, such as "forgetting how to do paperwork, going to appointments on the incorrect day, and forgetting what she is doing while performing tasks." (<u>Id.</u>).

11

Dr. McCurdy noted that Appellant was "frequently tearful throughout the evaluation" and "often covered her face with her hands and looked down at the floor while talking." (Id.). Nevertheless, Dr. McCurdy found her thought processes to be logical and coherent, her attention and concentration to be satisfactory, and her memory to be intact. (Id.). But she found Appellant's insight into her psychological functioning to be poor. (Id.). Upon testing Appellant for malingering, Dr. McCurdy found that she was not intentionally falsifying or exaggerating her symptoms. (T. 309).

Dr. McCurdy gave Appellant rule-out diagnoses of depressive disorder and anxiety disorder, not otherwise specified. (Id.). In making these diagnoses, however, Dr. McCurdy noted that she had not received any medical evidence regarding Appellant's complaints of depression or anxiety. (Id.). Thus, Dr. McCurdy surmised that, "[a]lthough [Appellant] is likely depressed, her symptoms may not always be at this level of distress." (Id.). In conclusion, Dr. McCurdy submitted the following prognosis:

> [Appellant] has the ability to understand simple instructions, as evidenced by her functioning during this evaluation. She should not have any difficulties remembering simple instructions, although she reported some difficulty remembering instructions due to her reported mild memory impairments. She will likely experience periods of difficulty carrying out simple instructions due to her decreased energy level and mood problems. Her concentration was adequate during this evaluation but i[t] may be inconsistent for basic work-related functions on a sustained basis due to the overall

12

> nature and severity of her clinical condition. Her
> ability to interact in a socially appropriate manner with
> co-workers, supervisors, and the public is poor,
> consistent with her presentation during this
> consultation. With regard to her mental status, she can
> likely adhere to a typical work schedule, although she
> may not be consistent in maintaining an adequate pace.
> She may also experience periods of exacerbated symptoms
> under distress that will likely further impair her
> functioning. If awarded benefits, she is able to manage
> finances independently.

(Id.).

### b.   Dr. Valerie McAdams

On December 2, 2010, Appellant met with Dr. Valerie McAdams, a licensed clinical psychologist, for a second consultative psychological evaluation. (T. 311). Appellant reported that she "cr[ies] a lot," has suicidal thoughts, and has a general loss of interest. (Id.). She said that some days she sees "no reason to get out of bed," and feels sad, worthless, and useless. (Id.). She reported "walking around nervous" and crying "for no apparent reason." (T. 312). According to Appellant, her friends claim that "they cannot cope with her anymore." (Id.).

As for her employment history, Appellant told Dr. McAdams that she had been unemployed since losing her job as a cashier in 2008, but she said that she had been "laid off due to company downsizing." (Id.).

Appellant reported to Dr. McAdams that she currently lived with in an apartment with two of her daughters and grandchildren. (Id.).

13

For hobbies, she said that she watches television and reads the Bible but has problems with concentration: "I just get confused. I can't put it into words." (Id.). She stated that she has no friends because "[s]he does not want to be around people when depressed and has no money to engage in activities." (Id.). Appellant reported that, while she is able to bathe and dress herself without assistance, she has "no energy" and "no place to go." (T. 313). She said that she sometimes forgets to take her medication, does not cook, and has trouble doing housework or shopping because of her low energy. (Id.). Dr. McAdams found Appellant's activities of daily living to be a fair estimation of her functioning. (Id.).

In conducting the mental status examination, Dr. McAdams found Appellant to be of average intelligence, with minor impairments to her short-term memory. (T. 314). Dr. McAdams noted that Appellant exhibited "very low energy," often looking down with her head in her hands and making little eye contact. (T. 313). Appellant's reasoning appeared lucid, and her speech was slow but coherent and adequately responsive. (Id.). Dr. McAdams found Appellant to be alert and oriented, with fair insight and judgment. (Id.). She did not suspect Appellant of malingering. (T. 314).

Dr. McAdams diagnosed Appellant with major depressive disorder, recurrent and moderate in severity. (Id.). As with Dr. McCurdy's evaluation, however, Dr. McAdams did not review the records of

14

Appellant's treatment for depression and anxiety; Dr. McAdams only had Dr. McCurdy's evaluation, Appellant's disability report form, and the intake evaluation from the Clayton Center. (T. 311). In conclusion, Dr. McAdams expressed the following:

> The claimant is able to perform daily tasks, but reported problems due to lack of energy. The claimant's daughter assists her with some of her daily activities. She appears to have adequate sustained attention to complete work tasks. The claimant is not expected to easily decompensate under normal work stress and did not report emotional factors affecting work performance in the past. She may benefit from a possible reassessment of medications to help with mood. With continued treatment, prognosis is expected to improve. Her depression appears to be compounded by her job loss and lack of income. No interpersonal difficulties are expected. She reported problems with concentration and memory, and minor memory problems were noted during the exam. However, she is able to understand, remember, and follow simple instructions. [Appellant] appears able to manage disability funds if awarded.

(T. 314).

### 2.   State Agency Reviewers

#### a.   Dr. Camilla Tezza

On February 18, 2010, Dr. Camilla Tezza completed a psychiatric review technique ("PRT") and mental residual functional capacity ("MRFC") assessment after a review of Appellant's field report, Dr. McCurdy's consultative evaluation, and a source recorded as "Clayton Ctr '09."[5] (T. 161-73, 189-92). Dr. Tezza did not indicate that she

---

[5]   It is not clear from Dr. Tezza's notes whether she intended to indicate that she had reviewed the Clayton Center's

had reviewed the treatment notes of Dr. Amin or any of Appellant's counseling therapists. (T. 173).

Dr. Tezza found that Appellant had experienced no episodes of decompensation and had "moderate" limitations in activities of daily living; maintaining social functioning; and maintaining concentration, persistence, and pace. (T. 171).

Dr. Tezza found Appellant's allegations to be "partially credible" because the medical evidence supported depressive symptoms, "but not to such extent that all employment would be precluded." (T. 173). She found that Appellant could attend work regularly but "may miss an occasional day of work due to psych s[ymptoms]." (T. 191). She also found that Appellant could understand and carry out simple instructions, may have difficulty with detailed instructions, and could maintain attention and concentration "for two[-]hour blocks of time." (Id.).

In assessing Appellant's MRFC, Dr. Tezza noted that Appellant was "moderately limited" in understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; working in coordination or proximity to others

---

intake evaluation only, as had Dr. McCurdy, or whether she had also seen other treatment notes from the Clayton Center in 2009. Appellant characterizes "Clayton Ctr '09" as "a single treatment note." [Doc. 9 at 15]. The Commissioner, in her brief, refers to it as "the 2009 evaluation notes of Clayton MHC," but concedes that Dr. Tezza "did not review all the evidence." [Doc. 10 at 12].

without distraction; completing a normal workday or workweek without interruptions from psychologically-based symptoms; interacting appropriately with the general public; responding appropriately to instructions and criticism from supervisors; getting along with co-workers; and responding appropriately to changes in the work setting. (T. 189-90). Dr. Tezza found Appellant to have no "marked" limitations and to be "not significantly limited" in all other areas. (<u>Id.</u>).

### b.   Dr. Linda O'Neil

On August 30, 2010, Dr. Linda O'Neil reviewed Appellant's case on reconsideration, noting that the record included updated treatment notes. (T. 304). Dr. O'Neil did not specify what treatment notes she reviewed; she did, however, state that they were "not from a 'medical source.'" (<u>Id.</u>). On reconsideration, she did not give an opinion as to whether Appellant's allegations were credible or the extent of Appellant's functional limitations. Instead, Dr. O'Neil recommended getting updated information from a medical source, particularly "an opinion about [Appellant's] ability to sustain a simple job considering only psych issues." (<u>Id.</u>).

A few months later, on January 14, 2011, after Appellant's second consultative examination had been submitted, Dr. O'Neil completed a PRT and MRFC assessment. (T. 175-88, 193-96). Dr. O'Neil's opinions were based upon her review of Dr. McCurdy's and

17

Dr. McAdams's consultative evaluations, and "t[reatment] notes (not medical source)." (T. 187). She found that Appellant had "some depression" but was only "partly credible" because she "report[ed] more issues than [the] vendor observed." (Id.).

In particular, Dr. O'Neil found that Appellant had "moderate" limitations in maintaining social functioning and maintaining concentration, persistence, and pace. (T. 185). She found "mild" limitations in activities of daily living. (Id.). As for episodes of decompensation, Dr. O'Neil found insufficient evidence to make a determination. (Id.).

In conducting Appellant's MRFC assessment, Dr. O'Neil found Appellant to have "moderate" limitations in the following areas: understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; completing a normal workday or workweek without interruptions psychologically-based symptoms; interacting appropriately with the general public; responding appropriately to changes in the work setting; and being aware of normal hazards and taking appropriate precautions. (T. 193-94). Dr. O'Neil found Appellant to have no "marked" limitations and to be "not significantly limited" in all other areas. (Id.).

18

###### c.   Dr. Carl Sherrer

On January 20, 2011, Dr. Carl Sherrer reviewed Appellant's case file on reconsideration. (T. 305). He noted that the file included no additional medical evidence of record or new opinion statements to be considered; thus, he found that Appellant's impairments continued to be nonsevere. (Id.). He found her allegations "[p]artially credible" because her claims of being unable to sit, bend, lift, or exert herself were "not supported by the objective findings, labs, [or] tests." (Id.).

##### 3.   Dr. Amin's Questionnaire

On July 20, 2011, two weeks before the administrative hearing, Dr. Amin completed a "Psychiatric/Psychological Impairment Questionnaire" for Appellant. (T. 412-19). He noted that he had been treating Appellant since June of 2009; that he had diagnosed her with recurrent major depressive disorder; and that he was treating her with Cymbalta and trazodone.[6] (T. 412). He listed her prognosis as "fair" and scored her lowest GAF in the past year as 60. (Id.).

---

[6]   Cymbalta is a brand name for duloxetine, which is used to treat depression and generalized anxiety disorder. It is classified as a "selective serotonin and norepinephrine reuptake inhibitor," which increases the amounts of serotonin and norepinephrine in the brain. MedlinePlus, U.S. Nat'l Library of Med., Nat'l Insts. of Health, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html (last visited June 27, 2013).

In the section for identifying the "positive clinical findings that demonstrate and/or support [his] diagnosis," Dr. Amin indicated that Appellant had exhibited poor memory; sleep disturbance; personality change; mood disturbance; feelings of guilt or worthlessness; difficulty thinking or concentrating; blunt, flat, or inappropriate affect; and generalized persistent anxiety. (T. 413).

Dr. Amin indicated that Appellant's mental status was "markedly limited" in the following abilities: carrying out detailed instructions; maintaining attention and concentration for extended periods; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without distracting them or exhibiting behavioral extremes; responding appropriately to changes in the work setting; being aware of normal hazards and taking appropriate precautions; traveling to unfamiliar places and using public transportation; and setting realistic goals and making plans independently. (T. 415-17). He found her to be "moderately limited" in all other areas. (T. 415-16).

Dr. Amin also indicated that Appellant experienced episodes of deterioration or decompensation in work-like settings; that she would likely be absent from work two to three times a month; that her impairments were likely to produce "good days" and "bad days";

20

that she was incapable of even "low stress"; and that she was not a malingerer. (T. 417-19).

### 4.   Appellant's Testimony

Appellant testified at the administrative hearing that she has "no energy." (T. 455). On a normal day, she sleeps late and then sits on the side of her bed, says a prayer, and sometimes just sits there for up to two hours. (Id.). She said that sometimes when she wakes up she is "scared for some reason" and does not know why, or she finds herself crying without knowing why. (Id.). When asked if she ever watches television, Appellant replied, "The TV be on, but, you know, I look at it and sometime I find myself not even watching TV, but it's — you know, I'm sitting there." (Id.).

Appellant testified that she sleeps only about four hours each night. (T. 456-57). She said that she often lies awake, thinking about her children and wishing she could "do more for them." (T. 457). Because of her poor sleep and general lack of energy, she claimed to lie down "about three or four hours off and on" between the hours of 9:00 AM and 5:00 PM. (Id.).

When asked why she believed she was unable to work, Appellant testified that it was due to the side effects of her medication. (T. 459). She said that her medication prevents her from performing as many household chores as she used to do. (T. 456). For example, she used to vacuum, sweep, and clean, but now her daughter only lets her

wash dishes and vacuum "a little." (Id.). She testified that her medication makes her drowsy, dizzy, and forgetful, which she finds "scary because I forget simple little things and I don't like that." (Id.). She also said that her medication has "cut" her appetite, which further contributes to her lack of energy. (T. 459).

### 5.   Vocational Expert Testimony

At the administrative hearing, the ALJ posed two hypothetical questions to a vocational expert ("VE"). (T. 461-63).

The ALJ first asked the VE whether any of Appellant's past relevant work could be performed by a hypothetical individual of Appellant's age, education, and work experience, who had no exertional limitations but had the following nonexertional limitations: (1) she could understand, remember, and carry out only simple instructions; (2) she could have no more than casual contact with the public, up to occasional contact with co-workers, and up to frequent contact with supervisors; and (3) she could not perform fast-paced production work. (T. 461-62).

The VE responded that such an individual would not be able to perform Appellant's past relevant work, but that she could work as a laundry worker, a sandwich maker, or a labeler, each of which were classified as "unskilled" work. (T. 462-63).

For the second question, the ALJ asked whether the same hypothetical individual could do any work if she were also unable

22

to (1) maintain attention and concentration for two-hour periods of time on a consistent basis; (2) handle work stress; or (3) handle routine changes in the work setting. (T. 463). The VE responded that no competitive work would be available under these additional limitations. (<u>Id.</u>).

Following the ALJ's hypotheticals, Appellant's counsel asked the VE whether a person who had to lie down for three to four hours during normal working hours would be able to engage in any employment. (T. 464). The VE responded that no employment would be available. (<u>Id.</u>).

### III.
### Standard for Determining Disability

An individual is considered disabled for the purposes of disability payments if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment must result from anatomical, psychological, or physiological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques, and must be of such severity that it precludes her from performing her previous work and, considering her age, education, and work

23

experience, any other substantial gainful work that exists in the national economy. §§ 423(d)(2)-(3), 1382c(a)(3)(B)-(C).

The claimant has the initial burden of establishing the existence of a "disability" by demonstrating her inability to perform her former type of work. Freeman v. Schweiker, 681 F.2d 727, 729 (11th Cir. 1982) (per curiam). If the claimant satisfies her burden of proving disability with respect to her former type of work, the burden shifts to the Commissioner to demonstrate that the claimant, given her age, education, work experience, and impairment, has the capacity to perform other types of jobs that exist in the national economy. Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983).

In evaluating a claim, the ALJ must consider whether: (1) the claimant is gainfully employed; (2) she has a severe impairment significantly limiting her ability to perform basic work-related functions; (3) her impairment meets the impairments listing; (4) she can perform past relevant work; and (5) she is disabled in light of her age, education, work experience, and residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f). If, at any step in the sequence, she can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. §§ 404.1520(a)(4), 416.920(a)(4).

**IV.**
**The ALJ's Decision**

In his August 26, 2011, decision, the ALJ found Appellant not to have been disabled at any time since the date her application was filed. (T. 23).

In particular, the ALJ found that Appellant had not been engaged in substantial gainful activity since the alleged onset date; that she had medically determinable and severe impairments of major depressive disorder and anxiety disorder; but that none of her impairments met or equaled a listed impairment. (T. 16, 18).

The ALJ found Appellant to have "mild" restrictions in activities of daily living. (T. 18). With regard to social functioning and concentration, persistence, and pace, the ALJ found that Appellant had "moderate" difficulties. (T. 19). The ALJ determined that Appellant had experienced no episodes of decompensation. (<u>Id.</u>).

The ALJ also found that Appellant had the RFC to perform a full range of work at all exertional levels, but with the following non-exertional limitations:

> [S]he can understand, remember and carry out simple instructions only, and can perform jobs that require no more than casual contact with the public, occasional contact with co-workers, and frequent contact with supervisors. The claimant is not capable of performing jobs that require fast paced production work.

(T. 20).

25

After establishing the RFC, the ALJ found that Appellant was unable to perform her past relevant work as a cashier, a cashier-checker, or a front office cashier. (T. 21). Nevertheless, the ALJ found that she could perform the jobs of laundry worker, sandwich maker, and labeler, each of which existed in significant numbers in the national and local economies. (T. 21-22). Accordingly, the ALJ found Appellant not to be disabled. (T. 22-23).

## V.
### Standard of Review

The scope of judicial review of the Commissioner's decision is limited. The Court's function is to determine if the decision is supported by substantial evidence and based upon proper legal standards. See Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). The ALJ's decision will not be disturbed by the Court if, in light of the record as a whole, it appears to be supported by substantial evidence. See 42 U.S.C. § 405(g); MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986). Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion. MacGregor, 786 F.2d at 1053. In contrast, review of the ALJ's application of legal principles is plenary. Foote v. Chater, 67 F.3d 1553, 1558 (11th Cir. 1995).

## VI.
## Discussion

Appellant contends that the ALJ erred (1) in the weight assigned to her treating psychiatrist, (2) in the determination of Appellant's credibility, and (3) by relying upon flawed VE testimony. [Doc. 9 at 10, 16, 20]. Appellant thus argues that a reversal and directed finding of disability, or a remand for further administrative proceedings, is warranted. [Id. at 23].

As explained below, the undersigned finds that the ALJ erred in assigning greater weight to the non-examining, state agency consultants than to Appellant's treating psychiatrist. The ALJ also erred in the credibility determination. These errors, in turn, infected the VE's testimony because her testimony was based upon hypothetical questions that may not properly have accounted for all of Appellant's limitations. Thus, **IT IS RECOMMENDED** that the ALJ's decision be **REVERSED and REMANDED** for additional proceedings consistent with this report and recommendation.

**A.   Did the ALJ Err in the Weight Assigned to Appellant's Treating Physician?**

Appellant argues that the ALJ erred by not giving controlling weight to the opinion of Dr. Amin, Appellant's treating psychiatrist. [Doc. 9 at 11]. Specifically, Appellant contends that the ALJ relied too heavily on the GAF score assigned to Appellant by Dr. Amin and improperly failed to consider the clinical findings

27

that supported his opinion. [Id. at 14]. Appellant also argues that the ALJ erred in relying upon the non-examining state agency reviewers because they did not consider the complete medical record in making their findings. [Id. at 15]. Appellant argues that the ALJ should have given Dr. Amin's opinion controlling weight. [Id. at 16]. Alternatively, even if the ALJ was not required in this instance to give controlling weight to Dr. Amin's opinion, Appellant argues that the ALJ erred by failing to consider any of the factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6) in weighing the opinion evidence. [Id. at 17].

The Commissioner argues in response that the ALJ properly gave "little weight" to Dr. Amin's opinion because it was inconsistent with his own clinical findings and other evidence of record. [Doc. 10 at 7]. The Commissioner contends that a GAF score of 60 indicates no more than "moderate" mental limitations, and that any error in relying on the GAF score would be harmless in light of other evidence showing Appellant not to be disabled. [Id. at 9-10]. Finally, the Commissioner contends that, "although [the state agency consultants] did not review all the evidence," the ALJ properly found their opinions to be consistent with the record as a whole. [Id. at 12-13].

The ALJ has a duty to consider all the evidence in the record, including each medical source opinion. 20 C.F.R. §§ 404.1520(a)(3),

404.1527(b)-(c), 404.1545(a)(3), 416.920(a)(3), 416.927(b)-(c), 416.945(a)(3). The opinion of a treating source on the nature and severity of the claimant's impairment will be entitled to "controlling weight" if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." §§ 404.1527(c)(2), 416.927(c)(2). In addition, "the testimony of a treating physician must be given substantial or considerable weight unless 'good cause' is shown to the contrary." Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1159 (11th Cir. 2004) (per curiam) (quoting Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997)).

The Eleventh Circuit has found "good cause" to exist when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004) (citing Lewis, 125 F.3d at 1440). "When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate its reasons." Phillips, 357 F.3d at 1241. But "[t]he good cause required before the treating physicians' opinions may be accorded little weight is not provided by the report of a nonexamining physician where it contradicts the report of the

treating physician." <u>Lamb v. Bowen</u>, 847 F.2d 698, 703 (11th Cir. 1988) (citing <u>Johns v. Bowen</u>, 821 F.2d 551 (11th Cir. 1987) (per curiam)).

In the event the ALJ does not give a treating physician's opinion controlling weight, the ALJ must consider the following factors in determining the weight to assign each medical source opinion:

> (1) whether the doctor has examined the claimant; (2) the length, nature, and extent of a treating doctor's relationship with the claimant; (3) the medical evidence and explanation supporting the doctor's opinion; (4) how consistent the doctor's "opinion is with the record as a whole"; and (5) the doctor's specialization.

<u>Forsyth v. Comm'r of Soc. Sec.</u>, 503 F. App'x 892, 892 (11th Cir. 2013) (per curiam); <u>see also</u> §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6). But "the ALJ is not required to explicitly address each of those factors" in his written decision. <u>Lawton v. Comm'r of Soc. Sec.</u>, 431 F. App'x 830, 833 (11th Cir. 2011) (per curiam).

In this case, Dr. Amin submitted a questionnaire that identified several "marked" limitations in social functioning. (T. 415-17). The ALJ explained that he was giving "little weight" to Dr. Amin's opinion because "it [wa]s inconsistent with the claimant's functional status and Dr. Amin's own clinical findings." (T. 21). The ALJ noted that (1) despite Dr. Amin's finding of several "marked" limitations in social functioning, a GAF score of 60

indicates no more than "moderate" limitations; and (2) that Dr. Amin did not include objective evidence or offer any explanation as to why certain functions were "markedly" limited. (Id.).

Appellant argues that Dr. Amin's opinion was entitled to controlling weight. After reviewing the record, the undersigned concludes that the ALJ had good cause for not assigning controlling weight to Dr. Amin's opinion. As the ALJ noted, Dr. Amin's finding of several "marked" limitations was inconsistent with his having assigned Appellant a GAF score of 60. A GAF score in the range of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV, supra note 2, at 34.

Although Appellant points out that "the Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings,'" Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (quoting Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)), this does not mean that the ALJ must ignore GAF scores. To the contrary, the Commissioner's regulations

31

require the ALJ to consider all the evidence in the record and to evaluate every medical opinion. 20 C.F.R. §§ 404.1520(a)(3), 404.1527(b), 416.920(a)(3), 416.927(b).

Thus, considering Appellant's GAF score, along with other evidence, was not error. See Wind, 133 F. App'x at 692 (citing claimant's GAF score among evidence of "moderate" symptoms); McCloud v. Barnhart, 166 F. App'x 410, 418 (11th Cir. 2006) (ALJ erred by mislabeling one GAF score as "moderate" and by failing to consider another GAF score); Wisner v. Astrue, 496 F. Supp. 2d 1299, 1304 (N.D. Ala. 2007) (collecting cases for the proposition that a low GAF score "is not in and off [sic] itself determinative of disability," but may be determinative in combination with other evidence). Such an inconsistency between a treating physician's clinical findings and medical opinion might support a finding of "good cause" for giving less than controlling, substantial, or considerable weight to that doctor's opinion. See Phillips, 357 F.3d at 1241; Edwards v. Sullivan, 937 F.2d 580, 583–84 (11th Cir. 1991) ("good cause" existed where the physician's opinion was contradicted by other notations in his own record). However, the undersigned questions whether this "inconsistency," standing alone, would be sufficient to justify less than substantial or considerable weight for the opinion on this case.

32

But Appellant's "moderate" GAF score on its own clearly does not constitute substantial evidence for giving Dr. Amin's opinion "little weight," even if the opinion is not entitled to controlling weight. The ALJ also stated that Dr. Amin had failed to support his findings with objective evidence. (T. 21). But Dr. Amin indicated on the questionnaire that he had made clinical findings that Appellant experienced poor memory; sleep disturbance; personality change; mood disturbance; feelings of guilt or worthlessness; difficulty thinking or concentrating; blunt, flat, or inappropriate affect; and generalized persistent anxiety. (T. 413). While some of these findings were not discussed in detail in Dr. Amin's brief treatment notes, it bears noting that many of these findings would have been observable to Dr. Amin, such that, by making these findings he must, by implication, necessarily have observed them. See 20 C.F.R. §§ 404.1528(b), 416.928(b); see also Blankenship v. Bowen, 874 F.2d 1116, 1121 (6th Cir. 1989) ("[W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology."). Moreover, Dr. Amin's clinical findings are largely consistent with the behavioral observations of Dr. McCurdy and Dr. McAdams, the only other medical sources in the record who actually examined Appellant.

33

Furthermore, even though the ALJ was not required to give controlling weight to Dr. Amin's findings, substantial evidence does not support the ALJ's reasons for assigning greater weight to the non-examining, state agency reviewing physicians. As a preliminary matter, it bears noting that "[t]he opinions of nonexamining, reviewing physicians . . . when contrary to those of the examining physicians, are entitled to little weight, and standing alone do not constitute substantial evidence." Sharfarz v. Bowen, 825 F.2d 278, 280 (11th Cir. 1987) (per curiam); see also Lamb, 847 F.2d at 703 ("The reports of reviewing nonexamining physicians do not constitute substantial evidence on which to base an administrative decision."). Social Security Ruling 96-6p, however, acknowledges that, under certain circumstances, "opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources." SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996).[7]

More to the point, SSR 96-6p provides that "the opinion of a State agency medical or psychological consultant or other program physician or psychologist may be entitled to greater weight than a

---

[7]    In the Eleventh Circuit, Social Security Rulings ("SSRs") are not binding on the Court but are entitled to deference. Fair v. Shalala, 37 F.3d 1466, 1467 (11th Cir. 1994).

34

treating source's medical opinion *if the State agency medical or psychological consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.*" Id. (emphasis added).

In this case, the ALJ gave "considerable weight" to the opinions of the three non-examining, reviewing physicians because their opinions were the "most consistent with the record as a whole" and "supported by comprehensive review of [Appellant's] medical records." (T. 20-21). But, as the reviewing physicians' statements indicate, their opinions were not actually based on a comprehensive review of the entire record. In fact, it is not clear whether any of the reviewing physicians even reviewed Dr. Amin's treatment records. Dr. Tezza indicated that she had reviewed Appellant's field report, Dr. McCurdy's consultative evaluation, and an unspecified record from the Clayton Center.[8] (T. 173). As discussed above, see supra Part II.C.2.a., it is not clear whether this Clayton Center record was a single treatment note or a series of treatment notes, but Dr. Tezza did not indicate that it reflected Dr. Amin's treatment. Later, when Dr. O'Neil reviewed the record, she remarked

---

[8]     See supra note 5.

that the only treatment notes she had were "generally not from a 'medical source'" and recommended getting "updates from a medical source." (T. 187, 304). Dr. Sherrer, who reviewed Appellant's claim on reconsideration, noted that the file contained no additional medical evidence to be considered. (T. 305). Indeed, it is not clear whether the state agency consultants were even aware that Appellant had been seeing a treating psychiatrist for two years.

Thus, it appears that the state agency reviewing physicians had considerably less comprehensive information than was available to Dr. Amin, particularly if they did not have Dr. Amin's own records to review. As substantial evidence does not support the ALJ's finding that the state agency consultants had each conducted a "comprehensive review of [Appellant's] medical records," the assignment of "considerable weight" to the state agency consultants' opinions was error. Accordingly, substantial evidence does not support the ALJ's decision to give more weight to the non-examining, state agency consultants than to Dr. Amin, Appellant's treating psychiatrist of more than two years.

The undersigned, therefore, **RECOMMENDS** that this matter be **REVERSED** and **REMANDED** to the Commissioner for further proceedings consistent with this report and recommendation. On remand, the ALJ shall reassess the weight assigned to the state agency consultants in light of the fact that they did not conduct a comprehensive

review of the entire record. The ALJ shall consider the factors set forth in 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6); state with particularity the weight assigned to each medical opinion and the reasons therefor; redetermine Appellant's RFC; and conduct any additional proceedings that may necessary.

**B.    Did the ALJ Err in Assessing Appellant's Credibility?**

Next, Appellant argues that the ALJ's decision should be reversed for failure to make a credibility determination in compliance with this Circuit's "pain standard." [Doc. 9 at 19]. Specifically, Appellant contends that it was error for the ALJ to rely on Appellant's GAF score or to assume that her failure to take her medication was not excusable. [Id.]. Appellant also argues that "it was not entirely accurate for the ALJ to find that the examining psychologists did not find [Appellant] disabled," contending that Dr. McCurdy's report is consistent with Dr. Amin's opinion. [Id. at 20].

In response, the Commissioner contends that the ALJ properly relied on evidence of the effectiveness of Appellant's medication, her noncompliance in taking her medication, the examining psychologists' and state agency consultants' opinions, and her daily activities in finding Appellant's symptoms to be not as severe as alleged. [Doc. 10 at 15-16]. Thus, the Commissioner argues that the ALJ committed no error. [Id. at 16].

37

As part of the ALJ's RFC determination, he must consider the effects of a claimant's pain and other symptoms. 20 C.F.R. §§ 404.1545(a)(3), 404.1529, 416.945(a)(3), 416.929. When statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a credibility finding. §§ 404.1545(e), 416.945(e); see also Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (per curiam); SSR 96-7p, 1996 WL 374186, at *4-5 (July 2, 1996).

The credibility finding includes a consideration of "all of the available evidence, including [the claimant's] history, the signs and laboratory findings, and statements from [the claimant], [her] treating or nontreating source, or other persons" regarding how her symptoms affect her. 20 C.F.R. §§ 404.1529(c), 416.929(c). The ALJ must also consider the claimant's daily activities; location, duration, frequency, and intensity of pain; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of pain medication; treatment the claimant receives or has received for pain or other symptoms; any measures the claimant uses or has used to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii); SSR 96-7p, 1996 WL 374186, at *5

38

(July 2, 1996); see also Davis v. Astrue, 287 F. App'x 748, 760 (11th Cir. 2008) (per curiam). If the ALJ decides not to credit a claimant's testimony, he must articulate explicit and adequate reasons for doing so that are supported by substantial evidence. Foote, 67 F.3d at 1562.

In this case, the ALJ found Appellant's statements concerning the intensity, persistence, and limiting effects of her symptoms not to be credible "because they are not supported by the medical evidence of record." (T. 20). To support this, the ALJ noted that (1) Appellant has generally been "doing well on medication," and that her reported worsening of depressive symptoms in July of 2010 could be attributed to her not "taking her anti-depressant medication as prescribed"; (2) Appellant's GAF score has never fallen below 60; and (3) neither examining psychologist has opined that Appellant was totally disabled. (Id.). Substantial evidence does not support the ALJ's reasons for finding Appellant not to be credible.

First, the ALJ discounted Appellant's credibility because she reported on at least one occasion that she had failed to take her medication as prescribed, but the ALJ's decision does not reflect that he considered whether she had good reason for doing so. "[T]he [Commissioner] may deny . . . benefits only when a claimant, without good reason, fails to follow a prescribed course of treatment that

39

could restore her ability to work." <u>McCall v. Bowen</u>, 846 F.2d 1317, 1319 (11th Cir. 1988) (citing 20 C.F.R. § 416.930; <u>Patterson v. Bowen</u>, 799 F.2d 1455, 1460 (11th Cir. 1986) (interpreting 20 C.F.R. § 404.1530)).

> However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner. The explanations provided by the individual may provide insight into the individual's credibility. For example:
>
> . . .
>
> The individual may not take prescription medication because the side effects are less tolerable than the symptoms.

SSR 96-7p, 1996 WL 374186, at *7-8 (July 2, 1996).

In this case, Appellant reported to Dr. Amin's nurse that she took her anti-depressants only three days a week because "I have acid reflux, and sometime the medicine irritate my stomach." (T. 303). The ALJ noted that "[i]t is not clear from the record whether she ever reported this side effect to Dr. Amin." (T. 17). This observation, however, is insufficient to show that Appellant was without good reason for not taking her medication regularly.

40

Appellant reported this side effect to the nurse on the same day that she was treated by Dr. Amin. See (T. 302, 303). The ALJ has given no reason to presume that Dr. Amin would not have reviewed his nurse's notes. Moreover, Appellant testified at the administrative hearing that her medication made her drowsy, dizzy, and forgetful. (T. 456). She said that she found the side effects to be "scary" because she did not like forgetting "simple little things." (Id.). The ALJ had an opportunity to ask Appellant questions, yet he failed to seek further elaboration as to the side effects of her medication or whether she had reported them to Dr. Amin. See (T. 445-59).

Second, the ALJ's statement that Appellant's GAF score had never dropped below 60 is not supported by the record. On at least one occasion, Appellant received a GAF score of 50, (T. 352), which indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV, supra note 2, at 34.

Finally, the ALJ's observation that neither of the examining psychologists had issued an opinion that Appellant was "totally precluded from work," without more, is insufficient to support a negative credibility finding. The opinion of whether a claimant is "disabled" or "unable to work" is an issue reserved to the Commissioner, §§ 404.1527(d)(1), 416.927(d)(1), and a medical source

41

opinion on an issue reserved to the Commissioner is not entitled to any "special significance." Flowers v. Comm'r of Soc. Sec., 441 F. App'x 735, 742 n.5 (11th Cir. 2011); Kelly v. Comm'r of Soc. Sec., 401 F. App'x 403, 407 (11th Cir. 2010); §§ 404.1527(d)(3), 416.927(d)(3). Thus, the failure of the examining psychologists to opine on an issue reserved to the Commissioner, standing alone, is not adequate to support a conclusion that Appellant's statements about her symptoms are not credible.

The Commissioner argues that Appellant's reported daily activities weaken her credibility. [Doc. 10 at 15-16]. Although a claimant's testimony that she participates in daily activities for short durations does not necessarily disqualify her from disability payments, the ALJ may consider these activities in assessing her disability. See Majkut v. Comm'r of Soc. Sec., 394 F. App'x 660, 663 (11th Cir. 2010) (citing 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i) (listing claimant's daily activities as one of the relevant factors to consider in evaluating claimant's symptoms)). In this case, however, the ALJ did not indicate that he had considered Appellant's reported daily activities in assessing her credibility, although he did discuss her daily activities elsewhere in his decision. See (T. 17). Rather, the ALJ expressly stated that he found Appellant's statements not to be credible "because they are not supported by the medical evidence of record." (T. 20). The ALJ

42

failed to state that he based his credibility determination on inconsistencies between the reports of her daily activities and the alleged severity of her symptoms. When this is the case, the Court "will decline to affirm 'simply because some rationale might have supported the ALJ's conclusion.'" <u>Winschel v. Comm'r of Soc. Sec.</u>, 631 F.3d 1176, 1179 (11th Cir. 2011) (quoting <u>Owens v. Heckler</u>, 748 F.2d 1511, 1516 (11th Cir. 1984) (per curiam)).

Accordingly, the ALJ's assessment of Appellant's credibility was not supported by substantial evidence. **IT IS THEREFORE RECOMMENDED** that this matter be **REVERSED AND REMANDED** for further proceedings consistent with this report and recommendation. On remand, the ALJ should consider the record in its entirety and follow the required steps in 20 C.F.R. §§ 404.1529, 416.929 as formulated in this Circuit's "pain standard." <u>See</u> <u>Wilson</u>, 284 F.3d at 1219; <u>Foote</u>, 67 F.3d at 1553.

**C.   Did the ALJ Err in the Hypothetical Questions Posed to the VE?**

Finally, Appellant argues that the VE's testimony does not support the ALJ's decision because the ALJ's RFC assessment, which he incorporated into the first hypothetical question posed to the VE, was not supported by substantial evidence. [Doc. 9 at 21]. Appellant points out that the VE responded to the ALJ's second hypothetical question, which Appellant claims was consistent with the limitations described by Dr. Amin, that no competitive work

43

would be available. [Id. at 22]. Appellant also argues that the ALJ's first hypothetical question failed to account for "moderate" limitations in concentration, persistence, and pace as required by the Eleventh Circuit's opinion in Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176 (11th Cir. 2011). [Id. at 22-23].

The Commissioner responds by asserting that the ALJ's first hypothetical question included all of Appellant's credible limitations. [Doc. 10 at 17]. The Commissioner contends that the ALJ was not required to account for limitations consistent with Dr. Amin's opinions or Appellant's testimony because the ALJ properly discounted Dr. Amin's opinions and found Appellant's testimony not to be credible. [Id.].

At step five of the sequential evaluation, the ALJ must determine if a significant number of jobs exist in the national economy that the claimant can perform. Phillips, 357 F.3d at 1239; 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). This determination can be made either by applying the Medical Vocational Guidelines or by obtaining the testimony of a vocational expert. Phillips, 357 F.3d at 1239-40. "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." Wilson, 284 F.3d at 1227 (citing Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999)). If the ALJ relies upon hypotheticals to the VE that

44

fail to include all of the claimant's limitations, the ALJ's decision is not supported by substantial evidence and remand is appropriate. Vega v. Comm'r of Soc. Sec., 265 F.3d 1214, 1220 (11th Cir. 2001); Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985) (per curiam).

In Winschel, the Eleventh Circuit concluded that substantial evidence did not support the ALJ's decision because the hypothetical posed to the VE failed to account for the findings made at earlier steps regarding limitations in concentration, persistence, and pace. 631 F.3d at 1180. In so concluding, the Winschel Court rejected the Commissioner's argument that an ALJ generally accounts for such limitations by restricting a hypothetical question to simple, routine tasks or unskilled work. The Winschel Court further noted that "the ALJ did not indicate that medical evidence suggested [the claimant's] ability to work was unaffected by this limitation, nor did he otherwise implicitly account for the limitation in the hypothetical." Id. at 1181; see also Scott v. Comm'r of Soc. Sec., 495 F. App'x 27, 29 (11th Cir. 2012) (per curiam) (finding hypothetical question sufficient where medical evidence demonstrated claimant's ability to engage in simple, routine tasks or unskilled work despite moderate limitations in concentration, persistence, and pace); Jarrett v. Comm'r of Soc. Sec., 422 F. App'x 869, 872 n.1 (11th Cir. 2011) (same).

45

In this case, the ALJ's hypothetical questions did not deviate from the standard set forth in Winschel. The ALJ explicitly accounted for Appellant's limitations in concentration, persistence, and pace by restricting the hypothetical individual from performing fast-paced production work but stating that she was still capable of understanding, remembering, and carrying out simple instructions. See Jarrett, 422 F. App'x at 871 (hypothetical question regarding individual "who could only 'understand, remember, [and] carry-out simple . . . tasks and concentrate for brief periods of time.'" sufficiently accounted for moderate limitations in concentration, persistence, and pace).

Nevertheless, as discussed above, the ALJ erred in the RFC determination by assigning greater weight to the opinions of the state agency consultants than to the opinion of Appellant's treating psychiatrist. See supra Part VI.A. The hypothetical questions posed to the VE based on the RFC may not, therefore, have accurately encompassed all of Appellant's limitations. Thus, in light of the above recommendation that this matter be reversed and remanded for the ALJ to reassess the medical source opinions and redetermine Appellant's RFC, the issue of whether the VE was presented with a proper hypothetical must also be remanded. On remand, the ALJ should pose a new hypothetical question to a VE that encompasses all of

46

Appellant's limitations, as determined from the reassessment of the medical source opinions and the record as a whole.

### VII.
### Conclusion

For the foregoing reasons, the undersigned **RECOMMENDS** that the decision of the Commissioner finding Appellant not to be disabled be **REVERSED AND REMANDED** for further proceedings consistent with this report and recommendation.

**SO REPORTED AND RECOMMENDED**, this 7th day of August, 2013.


    *s/ E. Clayton Scofield*
E. CLAYTON SCOFIELD III
UNITED STATES MAGISTRATE JUDGE

47